ANDERSON, Circuit Judge,
concurring in part in the judgment and dissenting in part:
I concur with the majority in that I too would reverse the district court’s dismissal of the tortious interference claim. However, because I have significant concerns with the analysis of that claim, I join in that portion of the opinion only as to the *1280 result. Additionally, because I am of- the opinion that the body shops have failed to plausibly allege the existence of the agreement required to state a federal antitrust claim and have failed to adequately plead their other state law claims, I would affirm the district court’s dismissal .of those causes. Accordingly, I concur in the judgment of the majority opinion with respect to Part VI.C, With regard to the remainder, I respectfully dissent.
I. Introduction
I do .not differ substantially from the majority in its framing of the relevant facts of this case. Based on the allegations, in the complaints,[1]1 accept that the insurance companies have engaged in a series of actions that are designed to depress the amounts they pay to body shops—-including to those body shops that are not signatories to a DRP agreement. I accept, for instance, that State Farm sets a market labor rate, that other insurance companies advise the body shops that they will pay no more than State Farm, and that, in setting this rate, State Farm: uses a methodologically unsound “half-plus-one” technique; manipulates survey data; threatens and effectuates removal of noncompliant shops' from its “preferred providers” list; and explicitly demands that shops lower their rates if they want to be preferred providers. I also accept that* the insurance companies refuse to pay for new parts, that they require the use of aftermarket or salvaged parts, and that they:-utilize industry-standard databases only when financially advantageous -to them; refuse to reimburse the cost of certain procedures and materials; require the shops’ participation in their parts procurement processes; and insist on discount programs. Lastly, I accept that the insurance companies engage in “steering,” that they discourage insureds from patronizing noncompliant repair shops.through “misrepresentation, insinuation, and casting aspersions,” and that they erroneously inform insureds that particular' shops: are not on their preferred provider lists; have had quality control issues; charge more than other shops; take longer than other shops; and do not perform work that can be guaranteed.
’My concern with the body shops’ complaints in this case—and with the majority’s treatment of those complaints—is not that they have failed to adequately describe a pattern of behavior that, taken as true, might be considered objectionable. Indeed, as to one of the asserted causes of action—the tortious interference claim—I am persuaded that these actions, if proven, are unlawful. Rather, my concern is that conduct does not become unlawful by virtue of having been deemed objectionable. *1281 Nor does it become unlawful in one context by virtue of having been found so in another. Accordingly, when considering a motion to dismiss, courts must carefully apply the well-pled allegations to the requirements of each asserted claim. With regard to the antitrust claims, binding case law indicates to me that the allegations of these complaints do not give rise to the necessary reasonable inference of agreement or conspiracy and, therefore, fail to state a claim. I also conclude that the allegations fall short of stating claims with regard to quantum.meruit and unjust enrichment. I discuss each in turn.
II. Federal Antitrust Claims
The body shops have repeatedly[2] argued that the above-recited facts, if proven, violate federal antitrust law. Thus we are tasked with answering, as the Supreme Court has phrased it, “the antecedent question of what a plaintiff must plead in order to state a claim under § 1 of the Sherman Act.” Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554-55, 127 S.Ct. 1955, 1964, 167 L.Ed.2d 929 (2007). Section 1 of the Sherman Act, under which both the price fixing and boycotting claims are brought, provides that “[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.” 15 U.S.C. § 1. As that statutory language suggests, the Act “does not prohibit [all] unreasonable restraints of trade ... but only [those] restraints effected by a contract, combination, or conspiracy.” Twombly, 550 U.S. at 553, 127 S.Ct. at 1964 (first two alterations in original) (quoting Copperweld Corp. v. Indep. Tube Corp., 467 U.S. 752, 775, 104 S.Ct. 2731, 2743, 81 L.Ed.2d 628 (1984)). The crucial consideration then' “is whether the challenged anti-competitive conduct ‘stem[s] from independent decision or from an agreement, tacit or express.’ ” Id. at 553, 127 S.Ct. at 1964 (alteration in original) (quoting Theatre Enters., Inc. v. Paramount Film Distrib. Corp., 346 U.S. 537, 540, 74 S.Ct. 257, 259, 98 L.Ed. 273 (1954)). Accordingly, the answer to our antecedent question turns on whether there is “a complaint with enough factual matter (taken as true) to suggest that an agreement was made.” Id. at 556, 127 S.Ct. at 1965.
In plausibly establishing the existence of such an agreement, “an allégation of parallel conduct and a bare assertion of conspiracy will not suffice.” Id. at 556, 127 S.Ct. at 1966. Indeed, long before Twombly:
It [was] well settled in this circuit that evidence of conscious parallelism alone does not permit an inference of conspiracy unless the plaintiff either establishes that, assuming there is no conspiracy, each defendant engaging in the parallel action acted contrary to its economic self-interest, or offers other “plus factors” tending to establish that the defendants were ... in a collusive agreement to fix prices or otherwise restrain trade.
City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 570-71 (11th Cir. 1998) (footnotes, citations, alterations, and quotations omitted). A showing of plus factors is necessary because they “remove [a plaintiffs] evidence from the realm of equipoise and render that' evidence more probative of conspiracy than of conscious parallelism.” Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1301 (11th Cir. 2003). Thus the body shops were re *1282 quired to plausibly allege the existence of both (1) parallel conduct and (2) sufficient “plus factors” from which we could infer an agreement.[3]
The majority, in a conclusion to which I do not object, finds that the body shops have established the existence of the necessary parallel conduct. Based on this conduct, I—like the majority—searched the complaints for plus factors suggesting the existence of the proscribed collusive agreement. As it detailed above, the majority’s search revealed two plus factors[4] that in its opinion support a plausible inference of an agreement to fix prices. Additionally, and although it declines to label them as such, the majority also apparently found sufficient plus factors to support an inference of an agreement to boycott. I am convinced that none of the identified factors—whether considered individually or together—will bear the weight attributed to them.
A. Price Fixing
Turning to the individual plus factors allegedly supporting horizontal price fixing,[5] the majority identifies two that it believes are suggestive of an agreement. Broadly speaking, the first concerns uniformity of price and the second concerns uniformity of action. I discuss each in turn.

1, Uniformity of Price

The majority first suggests that the insurance companies’ conduct “probably does not result from chance, coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties” because they have “adopt[ed] a uniform price despite variables that would ordinarily result in divergent prices.” Maj. Op. at 1271-72. As the majority’s recitation suggests, this plus factor consists of two components. First, the defendants must have adopted a uniform price. This component, however, is suggestive only of parallel conduct and, without more, will not justify invoking the plus factor. Accordingly, the uniform price must exist “despite variables that would ordinarily result in divergent pricing.” The second component is the indicator of the agreement that makes collusion more likely than conscious parallelism.
The sources on which the majority relies in introducing this plus factor make clear the necessity of both components. Indeed, the majority observes that the Supreme Court has inferred an agreement where “for many years, with rare exceptions, cement has been offered for sale in every given locality at identical prices and terms by all producers.” Maj. Op. at 1273 (quot *1283 ing FTC v. Cement Inst., 333 U.S. 683, 713, 68 S.Ct. 793, 809, 92 L.Ed. 1010 (1948)). But this is just the first component; the majority fails to point out that the record evidence in that case—discussed in the sentence immediately following the one that it quotes—established that “[thousands of secret sealed bids ha[d] been received by public agencies which corresponded in prices of cement down to a fractional part of a penny.” Cement Inst., 333 U.S. at 713, 68 S.Ct. at 809. Likewise, the majority quotes a leading antitrust treatise for the idea that an agreement may be present if rivals establish identical prices, but fails to grapple with the caveat that this is only true where there are “simultaneous identical bids on a made-to-order product not readily assembled from standard and conventionally priced items.” Maj. Op. at 1273 (quoting Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 1434b (3d ed. 2012)). Thus, while this so-called convergent pricing certainly is—or at least could be—a plus factor, it should only be invoked where we should otherwise expect divergent pricing. Considered in the appropriate light, the differences between the instant case and the sources on which the majority relies are substantial.
First, the focus on “secret,” “sealed,” and “simultaneous” bids is crucial precisely because it excludes the possibility of conscious parallelism: competitors cannot consciously parallel one another if they only learn of the other’s price after they have established their own. Perhaps sensing this, the body shops’ brief on appeal argues that “[a]ll of the [insurance companies] reach[] the same, identical ‘market rate’ ... which State Farm refuses to [make] public.” Brief of Appellants at 21. As an initial matter, alleging that State Farm does not publicly disclose the market rate and arguing that it is a secret are two very different things. The sources on which the majority relies do not focus on whether a certain party made the information public but, rather, simply on whether or not it was public. Stated differently, the fact that State Farm does not issue a press release with the market rate does not foreclose the possibility that it is publicly known. This is a crucial distinction.
However, giving the body shops the benefit of every inference in their favor as required in this posture, their argument in brief—-that State Farm does not publish its market rate—could charitably be read to suggest that the market rate is a secret. This would be a fairly damning allegation, and one that strikes right to heart of Cement Institute’s focus, if it were at all supported by the complaints. Unfortunately, there are no factual allegations—to speak nothing of evidence—that the market rate is a secret. Indeed, nowhere in the complaint do the body shops suggest that the labor rate is a secret. Quite the opposite, the complaint reveals that State Farm must necessarily tell the number to every repair shop in a given geographic area.
Moreover—even if it were possible to share the market rate with the body shops while, at the same time, keeping it a secret from the other insurance companies— there are no allegations at all that the other insurance companies knew what it was in advance. Indeed, rather than allege that all of the insurance companies approached the body shops with an identical market rate (which might possibly indicate that they had communicated in advance), the complaint alleges twice that the other insurance companies simply conform to State Farm’s rate—whatever that may be. Compl. at ¶ 62 (“Defendants ... specifically advised the Plaintiff they will pay no more than State Farm pays for labor.”); Compl. at ¶ 115 (“[Defendants [state] that they will conform to State Farm’s payment structure.”). Following the example set by a competitor, without agreeing to do so in *1284 advance, is textbook “price leadership”[6]— a practice we have repeatedly stated is insufficient to establish the existence of an agreement. See, e.g., Williamson Oil, 346 F.3d at 1301-03; City of Tuscaloosa, 158 F.3d at 571. Accordingly, even if State Farm’s market rate were a secret—which, again, the body shops do not allege—such a fact would be of no use when the other insurance companies are not also alleged to have known the number in advance.
Further distinguishing our case from the examples on which the majority relies is the fact that auto body repairs are not the type of “made-to-order product not readily assembled from standard and conventionally priced items” where we expect to see divergent pricing. Maj. Op. at 1271-72 (quoting Areeda ¶ 1434b). On the contrary, the “products” here—cars—are so readily assembled from standard parts that their assembly-line manufacturing set the standard for other industries. That the body shops are repairing those cars, rather than assembling them for the first time, does not make the parts used to do so any less standard. And they are so conventionally priced that, as discussed below, the body shops believe that the insurance companies should not be allowed to deviate from third-party databases that set standardized prices. Certainly, some parts—such as spark plugs, windshield wipers, brakes, and tires—may be standard ■ across many makes and models of 'cars, while others— such as doors, windshields, headlights, and fenders—may only fit a few. But for" the overwhelming majority of cars, the necessary parts are" ubiquitous, interchangeable, and standardly priced. Thus, while convergent pricing where it should otherwise not be expected can undoubtedly serve" as a plus factor, none of the indicators to which courts and commentators have traditionally looked to support such a factor—or at least none to which the body shops or the majority have pointed—are present here.
Neither the body shops nor the majority have pointed to any plausible reason that one should expect that prices in this market—involving standardized automobile parts and repairs—would be divergent. Quite the contrary, the body shops argue that the insurance companies should comply with several databases that exist for the sole purpose of establishing standardized pricing. That is, the fact that the body shops insist that the insurance companies should comply with the prices published in these three separate databases assumes that such prices are standardized, and that one should expect convergent prices;—not divergent prices.
In short, the instant case bears none of the traditional hallmarks of a situation in which uniform pricing is present in an industry where we would otherwise not expect it. Nor are any of the other reasons offered by the body shops (or the majority) suggestive of an environment in which we would expect to see divergent pricing. The majority’s reliance on this plus factor is premised on an assumption that there has been an “adoption of a uniform price despite variables that would ordinarily lead to divergent prices;” yet I see no indication that I should expect to see divergent pricing in this industry. And without an expectation of divergent pricing all that remains is an allegation of uniform pricing, which is indicative only of parallel conduct. Accordingly, I would reject this plus factor as an indicator, of the necessary agreement.

*1285
2. Uniformity of Tactics

As to its second plus factor, the majority concludes that the insurance companies have engaged in uniform practices suggestive of an agreement. Maj. Op. at 1272. True enough, several courts have found a plus factor where there is a similarity of language, terms, or conditions used by the alleged co-conspirators that would be improbable absent collusion. See, e.g., Apex Oil Co. v. DiMauro, 822 F.2d 246, 256-58 (2d Cir. 1987); De Jong Packing Co. v. U.S. Dep’t of Agric., 618 F.2d 1329, 1332-34 (9th Cir. 1980). And, true enough, the body shops’ appellate briefing describes the insurance companies’ tactics as “the same,”’“identical,” and part of a “script[ ].” Brief of Appellants at 22. Thus, if I were required to accept the well-pled allegations of a brief as true I might be- inclined to agree with the majority.
Unfortunately, the body shops’ appellate briefing is once again betrayed by their complaints, which introduce the relevant tactics as follows:
Through various methods;- the [insurance. companies] have, independently and in concert, instituted numerous methods of coercing the [body shops] into accepting less than actual; and/or market costs for materials and supplies expended in completing repairs.
Compl. at ¶ 63. Whatever else can be said about that allegation, I see no reason to conclude—as the majority obviously does—that the body shops even believe the tactics were highly uniform.[7] Indeed, the complaint reflects nothing approaching the level of conviction about the body shops’ allegations that the majority reads into it.
Nonetheless, the majority concludes-that the insurance companies have engaged in uniform tactics because they have all required the body shops “to repair a faulty part rather than install -a replacement part; to install a used or recycled part; and to offer discounts and concessions.” Maj. Op. at 1273. Even if these tactics were highly uniform, they are suggestive of an agreement only when those tactics would not plausibly arise from “independent responses to common stimuli.” See Twombly, 550 U.S. at 556 n.4, 127 S.Ct. at 1965 n.4 (quoting Areeda H.1426). Yet, the majority fails to address the fact that all three of these “highly uniform” tactics are easily explained by the most common of corporate stimuli: a desire to increase profits. And while some methods of increasing profits could be so idiosyncratic as to be unlikely to arise in the absence of an agreement, such is plainly not the case here. None of these tactics could even be fairly described as novel, let alone as sufficiently idiosyncratic to support an inference of an agreement; It can hardly be denied that repairing (rather than replacing) damaged parts, installing recycled (rather than new) parts, and requiring discounts áre among the most common and time-worn method's of increasing corporate profits in any industry, let alone in an industry where parts and labor reimbursements are the primary business expenditures. Cf. Maj. Op. at 1270-71 (setting forth an established legal principle, which I respectfully submit the majority then fails to apply: “But plaintiffs’ plus factors are no more consistent with an illegal agreement than with rational and competitive business strategies, independently adopted by firms acting within an interdependent market.” (quoting In re Musical Instruments & Equip. Antitrust Litig., 798 F.3d 1186, 1189 (9th Cir. 2015))). And yet, *1286 under the standard announced today, the mere existence of an industry-wide practice permits an antitrust plaintiff to establish a plus factor.
I do not believe that a complaint merely alleging several common (and obvious) industry practices should proceed directly past a motion to dismiss and into the expensive and settlement-inducing quagmire of antitrust discovery. The Supreme Court has described precisely this problem:
[E]ven if [defendants committed all the acts] in all the ways the plaintiffs allege, there is no reason to infer that the companies had agreed among themselves to do what was only natural anyway; so natural, in fact, that if alleging parallel decisions to resist competition were enough to imply an antitrust conspiracy, pleading a § 1 violation against almost any group of competing businesses would be a sure thing.
Twombly, 550 U.S. at 566, 127 S.Ct. at 1971 (citation omitted).
In short, the majority’s analysis of its second plus factor suggests that the insurance companies’ tactics are highly uniform when even the complaint does not seem to believe that; declines to explain how it divined which of the challenged activities occurred “in concert” and which occurred “independently;” and relies upon several alleged tactics which are clearly common, obvious, and mainstream. In contrast to the majority, I do not believe an inference of prior agreement arises from the mere fact that several insurance companies adopt policies favoring use of cheaper parts and offering discounts to insurance companies. I respectfully submit that the majority’s analysis is inconsistent with Supreme Court and Eleventh Circuit precedent. Accordingly, as with the first, I would reject the second plus factor and affirm the dismissal of the price fixing claim.
B. Boycotting
Despite my substantial doubts about the existence of a price fixing agreement, the allegations suggesting an agreement to boycott are even weaker. At least in their price fixing allegations the body shops made passing reference to an agreement. Not so with respect to a boycott agreement. While I do not consider it disposi-tive, it is certainly noteworthy that the body shops never allege—even in a conclu-sory fashion—an agreement to steer customers away from, or to boycott, the body shops.[8] Neither the “steering” allegations nor the “boycott” section of the complaint allege the existence of an agreement to do so. And even if we incorporate the allegations of an agreement from the price fixing sections of the complaint, I respectfully submit that the instant complaint would still fall short of even the “few stray statements [that] speak directly of agreement” which the Supreme Court has held are insufficient. Twombly, 550 U.S. at 564, 127 S.Ct. at 1970.
Undisturbed by the fact that the body shops do not even profess a belief in the existence of an agreement to boycott, the majority concludes a brief reversal of the boycotting claim with the following analysis:
Accepted as true, the body shops’ allegations readily and plausibly establish the per se violation of boycotting. The body shops allege that the insurance companies targeted non-compliant shops by keeping insureds away until those shops charged at or less than the market rate. And the body shops allege that, in accor *1287 dance with the agreement, the insurance companies used identical tactics to keep insureds away.
Maj. Op. at 1276 (alteration in original). Thus the majority offers two allegations— it declines to call them plus factors—which it apparently believes support the existence of an agreement to boycott: steering and the use of identical tactics in that steering.
As an initial matter, an allegation of steering—standing alone—cannot be indicative of an agreement. Steering is a decidedly unilateral activity; it involves one insurance company steering one of its customers away from one of the body shops. Accordingly, even if all of the insurance companies engage in it, steering itself suggests only parallel conduct. Of course, as the tortious interference claims suggest, it is potentially illegal parallel conduct. But it is only parallel conduct all the same.
That said, if there were allegations that “the insurance companies used identical tactics to steer insureds away,” as the majority claims, the needle would move toward an inference of the existence of an agreement if, but only if, such similar or identical tactics would not plausibly arise from “independent responses to common stimuli.” Twombly, 550 U.S. at 556 n.4, 127 S.Ct. at 1965 n.4. But once more, the body shops have asserted in their- appellate briefing—and the majority has sanctioned—facts that are simply unsupportable on this record. Indeed, although the body shops have argued on appeal that “[a]ll of the Defendants utilize the same script containing identical false and misleading steering statements,” Brief of Appellants at 30, neither they nor the majority opinion suggest where I can find such an allegation. Both the word “script”—as used by the body shops—and the word “identical”—as used by the majority—are conspicuously absent from the complaints.
Almost as troubling as what the body shops have not pled and yet are given credit for is what they have pled and yet are not held to account for. With regard to steering, the body shops allege that:
Examples of this practice include telling insureds and/or claimants that a particular chosen shop is not on the preferred provider list, that quality issues have arisen with that particular shop, that complaints have been received about that particular shop from other consumers, that the shop charges more than any other shop in the area and these additional costs will have to be paid by the consumer, that repairs at the disfavored shop will take much longer than at other, preferred shops and the consumer will be responsible for rental car fees beyond a certain date, and that the Defendant cannot guarantee the work of that shop as it can at other shops.
Compl. at ¶ 83. From this, it is argued— and I am asked to conclude—that the body shops have engaged in “identical” tactics. But even a basic illustration of the pleading trick at work here reveals a fatal flaw. Assume that State Farms steers a consumer using excuse X; 21st Century steers a consumer using excuse Y; and GEICO steers a consumer using excuse Z. The body shops can (truthfully) make the following allegation: “The insurance companies engage in steering. Examples of these tactics include X, Y, and Z.”[9] In reality, tactics X, Y, and Z are in no way identical. And yet—using this exact pleading formula—the majority here would infer that the companies use identical tactics and allow a claim to lie for antitrust boycotting. Put another way, the body shops’ allegations— *1288 and the conclusion the majority ■ draws from them—is akin to saying: (1) that a group of people “travel” to get to work; (2) that “examples of this ‘travel’ include driving cars, riding bikes, boarding trains, and walking on' sidewalks;” and (3) that these people, therefore, use “identical tactics” to get to work. This simply cannot be the case.[10]
Put simply, the majority relies upon two asserted plus factors: one (steering) is at best indicative of parallel conduct and the other (identical tactics) has no basis in the complaint. Moreover, even if the insurance companies were alleged to have used the same or similar reasons why their insureds should not use a particular body shop, established case law would still require a court to then address whether such similarity would be improbable absent collusion or, rather, whether it was equally plausible as independent responses to common stimuli.[11] For the forgoing reasons, I conclude that the complaints fall short of alleging facts giving rise to an inference'of an agreement or conspiracy to boycott the body shops.
C. Conclusion
As the Supreme Court has observed, “it is only by taking care to require ■ allegations that reach the level suggesting conspiracy that we can hope to avoid the potentially enormous expense of discovery in cases with no ‘reasonably founded hope that the [discovery] process will reveal relevant evidence’ to support a § 1 claim.” Twombly, 550 U.S. at 559, 127 S.Ct. at 1967 (alteration in original) (quoting Dura Pharm., Inc. v. Broudo, 544 U.S. 336, 347, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005)). The care required is, at a minimum, enough to ensure that the facts which are used to justify invoking a plus factor are actually alleged, and that the plus factors demonstrate parallel behavior plus something else sufficient to give rise to a plausible inference of the existence of an agreement or conspiracy. Because the body shops’ complaints reveal' significant shortcomings on both of these basic requirements, I would affirm the district court’s dismissal of both federal antitrust claims.[12] Accordingly, I respectfully dissent from the Majority's decision with regard to the antitrust claims.
III. State Tort Claims
The district court also dismissed, as relevant hei’e, three state law claims brought by.the.body shops. As does the majority, I would reverse the dismissal of the body shops’ tortious interference claims. Unlike the majority, however, I would affirm the dismissal, of both, the.-unjust enrichment and quantum meruit claims because neither is justified by the allegations of the complaint.
A. Unjust Enrichment
I respectfully dissent from the majority’s decision to reverse the district court’s *1289 decision dismissing the body shops’ unjust enrichment claims. In all of the complaints there is an allegation to the- effect that each insurance company specifically advised each body shop that they would pay no more than State Farm pays. Compl. at ¶ 62 (“Defendants ... specifically advised the Plaintiff they will pay no more than State Farm pays for labor.”). Thus it is clear that the body shops knew before undertaking the repair that they were to be paid certain amounts or in certain ways. The body shops then undertook the repair anyway. Accordingly, it is simply not unjust for the insurance companies to retain whatever “benefit” (if any) that they might be deemed to have received.
Under the laws of the four states relevant here—Kentucky, Missouri, New Jersey, and Virginia—one of the elements of an unjust enrichment claim is that it would be unjust or inequitable for the defendant to retain the benefit allegedly conferred upon it,[13] Because each complaint at issue here specifically alleges that each insur-anee company advised the body shops that it-would pay no more than State'Farm pays, it clearly was not unjust for each ’insurance company to pay only that amount and no more.
Moreover, there is an indisputable principle of law set forth in the Restatement (Third) that where the parties have an opportunity to arrive at a contract and do not do so, the . courts will generally not go behind them and. establish a valuation for their transaction. See Restatement (Third) of Restitution and Unjust Enrichment § 2 cmt. d (2011) (“Instead of, proposing a bargain, the restitution claimant first confers a benefit, then seeks payment for its value. When this manner of proceeding is unacceptable—as it usually is, if the claimant neglects an opportunity to contracta claim based on unjust enrichment will be denied.” (emphasis added)). As the district court correctly held, the body shops’ unjust enrichment claims fail because they had an opportunity to bargain for a deal they considered to be fair and failed to do so.[14] Forgoing their opportunity to bar *1290 gain, and notwithstanding the fact that the insurance companies had specifically advised that they would pay no more than State Farm pays, the body shops nevertheless undertook the repairs and are now seeking to require the insurance companies to pay more than State Farm had said it would pay. In my judgment, the unjust enrichment claims of the body shops are not only without merit, they border on being frivolous claims. I would affirm the judgment of the district court with regard to the unjust enrichment claims, and I respectfully dissent from the majority’s decision to reverse.
I also briefly set forth two additional concerns with regard to the majority’s analysis of the unjust enrichment claims. First, in service of a conclusion that the insurance companies’ actions were somehow unjust, the majority stretches the words “forced” and “involuntarily” until they cover basic participation in a free market economy. Second, the majority implicitly resolves an open question of state law without any analysis at all. Both are problematic.
My first concern with the majority’s analysis is its determination that it would be unjust for the insurance companies to retain any benefit based on the explanation that “the body shops consistently allege that the insurance companies forced the shops to confer benefits; that the shops involuntarily performed repairs at the low market rate.” Maj. Op. at 1278 (first emphasis added). While it is not possible here to raise all of the secondary consequences of the majority’s conclusion that the body shops were “forced” into “involuntarily” performing repairs, I find it worthwhile to highlight just a few of my more serious concerns.
As an initial matter, the majority’s analysis calls into question the principle, discussed above, that parties who have an opportunity to contract in advance should do so and, if they do not, the courts should generally refrain from establishing a value in quasi-contract after the fact. Accord Restatement (Third) of Restitution and Unjust Enrichment § 2 cmt. d (2011) (quoted above). As the Seventh Circuit has recognized, “[bjetter that the [plaintiff] should negotiate with the defendant rather than thrusting on the court the difficult task of constructing a hypothetical bargain.” Nadalin v. Auto. Recovery Bureau, Inc., 169 F.3d 1084, 1086 (7th Cir. 1999). The majority turns this traditional conception on its head and places those who forgo a contract in a better legal position than those who contract in advance. This is evident from that fact that the body shops in the instant appeal—who did not negotiate a DRP agreement—are permitted to bring otherwise unavailable state law claims while those shops who (as the law encourages) contracted in advance through a DRP are limited to suing on their contracts. As the majority notes, none of the body shops in the instant appeal are a part of a DRP. This is not an accident. The body shops are well aware that if they are signatories to a DRP agreement, their remedy lies in contract rather than in the unjust enrichment actions they bring here.
Nonetheless, the majority apparently concludes that the body shops’ failure to strike an acceptable bargain for their services prior to performing the repairs is excusable because the insurance companies allegedly “forced” them to “involuntarily” perform the repairs at State Farm’s market rate. I respectfully submit that the majority has—in its attempt bring the body shops’ allegations within the scope of unjust enrichment—expanded the definition of those two words beyond their accepted meaning. The majority’s use of the *1291 term “forced” in the instant context is inconsistent with the facts actually pled by the body shops. The body shops were under no obligation, legal or otherwise. They were not threatened or tricked. They were not coerced.[15] They simply made themselves available to perform a service for compensation, the amount of which they were advised before undertaking the repair. They are now dissatisfied with that amount of compensation and are suing for more. Like any other service provider, they have—or at least had—three options: (1) perform their service for the price that someone else was willing to pay; (2) negotiate for a higher fee; or (3) decline to perform the service. Every company in America recognizes that finding the proper mix of those three basic choices is a crucial part of achieving—or maximizing—profitability. What the body shops now seek is a fourth option: run to the federal courts and complain of being “forced” into performing their service.[16]
It is no exaggeration to say that the majority’s apparent holding threatens some basic tenets of our economic system. As just one example, consider a homeowner who makes known that she will pay $10,000 to have her house painted, claiming (truthfully or not) that this is the going rate. A painter, believing that the actual market rate (again, truthfully or not) is $15,000, paints the house and the owner writes him a check for $10,000. If the failure to contract is no longer a barrier in this Circuit—as would seem to be the case under the majority opinion[17]—the painter then sues for unjust enrichment of $5,000 on the theory that the market rate established by the owner was too low. Has she “forced [him] to confer benefits?” Has he “involuntarily performed [the painting] at the low market rate?” Has she been unjustly enriched? Surely these questions must be resoundingly answered in the negative. And if that must be so, there is no principled reason why the answer to our present question should be any different.
Nor does this example become any more unjust by virtue of a shift in the parties’ relative bargaining power.[18] Suppose that, rather than a singular homeowner, a real estate developer desires to have an entire *1292 subdivision of homes painted at a rate of $9,000 each. This amount consists of the $10,000 “market rate” and a 10% “volume discount.” The painter is faced with the same options as our body shops: conform .to the rate and-accept the discount, negotiate with the developer, or forgo the business. The fact that this is a large chunk of the painter’s business notwithstanding, it cannot be seriously argued that he is being forced to paint the houses. Nonetheless the painter—if the majority’s opinion and its logical, consequences are to be taken at face value—can now undertake the job, collect the discounted rate ($9,000 per house), and then sue the company for the remaining amount it feels it is owed.[19]1 am troubled by this possibility.
My second concern is the majority’s implicit decision on an open question of state law. Both on appeal and in the district court, the insurance companies argued that, because the body shops repaired cars belonging to the insureds, any. .benefits were rendered to them and not to the insurance companies. This argument was sufficiently persuasive that the district court had previously dismissed another action in this litigation because, under Florida law, the benefits were conferred not on the defendant insurance companies but rather on their insureds.[20] However, in the instant case, the district court recognized that outside of Florida, the courts are divided on the issue of whether, in the insurance context, the benefit is bestowed on the insured or the insurance company. For that reason, the district court dismissed the instant unjust enrichment claims on alternative grounds.[21] Although it was not a basis for the decision below, this question—on whom' the benefit was conferred—was discussed in the magistrate’s report and recommendation, in the district court’s order, and in the appellate briefing.
Implicitly deciding this open issue of state law, the majority simply holds, twice, that the body shops stated a valid claim for unjust enrichment. Maj. Op. at 1276 (“The allegations readily and plausibly establish the claims of unjust enrichment.”); Maj. Op. at 1278 (“[T]he allegations have sufficiently established the body shops’ state tort claims of unjust enrichment....”). In doing so, the majority has necessarily decided that all of the elements have been satisfied. Thus the majority has implicitly decided that, under the laws of all four states, the benefit is to be deemed conferred on the insurance company, not the insured.
The majority’s implicit decision might be understood if the case law so clearly supported one side or the other as to not be Worthy of lengthy discussion. Unfortunately, the opposite is true. In many states— including, as far as I can tell, each of the four that are relevant here—the proper resolution of this issue remains an open *1293 question.[22] And, in addition to its being an open question in the relevant states, the states that have decided the question differ widely in their approach.[23]
In implicitly deciding this issue, the majority opinion has the effect of foreclosing the insurance companies from raising the argument on remand. Even if the majority must reverse the district court and hold that the body shops have adequately pled that the insurance companies’ retention of benefits was unjust, I respectfully submit that the majority should have remanded this issue of first impression to the district court to resolve in the first instance on remand.
For the reasons discussed above, I would affirm the judgment of the district court with respect to the unjust enrichment claims, and I respectfully dissent from the majority’s decision in this regard.
B. Quantum Meruit
I must also register my dissent from, the majority’s decision to reverse the district court’s dismissal of the quantum meruit claims arising under the state laws of Kentucky, New Jersey, and Virginia.[24]1 would have affirmed the judgment of the district court because, under the laws of the three states relevant here, the body shops were required to allege, among other elements, that the circumstances reasonably notified the insurance companies that they expected to get paid (Virginia and Kentucky) or that they reasonably expected to be compensated (New Jersey).[25] They cannot do so here.
As I have discussed above, the body shops specifically alleged that each of the insurance companies informed them that they would pay no more than State Farm. The body shops then undertook the repairs. Having fully informed the body shops of what they were willing to pay, the circumstances could have only reasonably informed the insurance companies that the body shops expected to be paid the market rate. This ’is fatal to the Virginia and Kentucky claims. Likewise, having been fully informed that the insurance companies would only pay the market rate, the body shops could not have reasonably expected to receive more than that amount. This is fatal to the New Jersey claim.
Respectfully, I think that the majority’s analysis contains two flaws that have resulted in our differing views on the resolution of this issue. The first is the majority’s conclusion that, because the body shops had a reasonable expectation of some compensation, they need not demonstrate a reasonable expectation as to the amount they are now requesting. Maj. Op. at 1277 *1294 (“The body shops allege that they rendered repair services, expecting compensation ... and- that the companies paid an artificial price, below the reasonable value for the services.”)- Undoubtedly, the body shops could reasonably have expected some compensation. Equally undoubtedly, they could not—at least not reasonably— have expected to receive more than the market rate when, by their own pleadings, every insurance company informed them that they intended to pay no more than that rate. Unconcerned with this distinction, the majority apparently concludes that because they expected some compensation, they are entitled to have a court determine not just what they could reasonably have expected, but—regardless of their expectations—the reasonable value of the services they provided.
The body shops have not cited, and independent research has not uncovered, any controlling authority in the three relevant states to such an effect. Thus, without any explanation as to why, the majority appears to have decided an open question of state law on a state cause of action. As I have mentioned previously, deciding open state law questions with no explanation might be understandable if other authority overwhelmingly pointed in a single direction. Such is not the case. The only analogous case law suggests the exact opposite result of that reached by the majority: when a plaintiff has a reasonable expectation of some amount, they cannot reasonably expect to receive additional compensation and therefore cannot bring suit to recover it.[26]
It is not at all surprising to me that the courts to consider this issue have resolved it differently than the majority given that it is indistinguishable from the house painting example in the previous section. True enough, the painter could have expected some compensation ($10,000) for performing a service (painting the house). But—having already received what he could have reasonably expected in compensation—surely he is not now entitled to file a lawsuit for quantum meruit, allege that the reasonable value of his services is $15,000, and have a court determine what should be paid him. And yet as surely as such a conclusion is implausible, it would logically follow from today’s decision. It simply cannot be the law that a plaintiff, knowing full and well that it has no reasonable expectation of receiving what it considers the fair market value of its services, can nonetheless perform a service and then survive a motion to dismiss in its subsequent suit to recover that “full” value. This is unworkable for the business community and unsustainable for the judicial community.
My second concern is that the majority, again in the quantum meruit context, has implicitly decided the same open question of state law referred to above in my discussion of unjust enrichment. Again, the majority has implicitly decided that, under the laws of the three relevant states, the quantum meruit law contemplates in the insurance context that the car repairs constitute a service to the insurance company rather than (or in addition to) the insured. However, as in the unjust enrichment context, this is an open question of state law that was not addressed by the district court and has decisively split the jurisdictions to confront it. In so doing, the majority tackles a substantial and unresolved *1295 question of state law, without any analysis. I respectfully submit that the more appropriate resolution for the majority would have been to remand the issue to the district court for resolution in the first instance.
For the reasons stated in the first two paragraphs of this section, it is clear to me that the allegations of these complaints fall far short of stating any claim for quantum meruit. Accordingly, I would affirm the judgment of the district court in this regard. I respectfully dissent from the majority’s decision with respect to the quantum meruit claims.
C. Tortious Interference
Lastly, although I agree with the majority that the dismissal of the tortious interference claims was in error and is due to be reversed, I disagree with the reasoning employed by the majority in reaching that decision. As an initial matter, I would have reversed the district court’s decision to dismiss the tortious interference claims for allegedly impermissible group pleading. The concerns raised by the district court stem not from the fact that the insurance companies are unable to ascertain which aspects of the alleged conduct apply to them but, rather, from the fact that it was not clear to the district court how that conduct amounts to a viable claim. This is a pleading problem to be sure, but it is not a group pleading problem. Accordingly, the dismissal was due to be reversed on that basis alone.
I would a}so have found that the body shops adequately stated a claim under the laws of each of the four states. Although the elements of the claim are not identical, there are three requirements of tortious interference that are both common to all four of the relevant states and which could reasonably be contested by the parties: (1) the body shops must have had a valid business expectancy; (2) the insurance companies must have had knowledge of that valid business expectancy; and (3) any interference must have been improper.[27] All are satisfied by the steering allegations. The first requirement is met because the body shops allege that the insureds had chosen a particular body shop, Compl. at ¶ 83 (“Examples of this practice include telling insureds and/or claimants that a *1296 particular chosen shop is not on the preferred provider list....” (emphasis added)), thereby raising the shop’s prospective economic interest above a purely speculative level. Secondly, the steering allegations also make clear that the insurance companies had knowledge of the prospective economic advantage—if they did not know that an insured had chosen a shop they would not have been able to steer them away from it. Lastly, the allegations of the complaint suggest, among other things, that steering is done to “punish” noncompliant shops, that it is accomplished through “misrepresentation of facts,” and that it is “malicious.” Compl. at ¶¶ 36, 82, & 107. Taken as true, such behavior is sufficiently improper to survive a'motion to dismiss. Accordingly, in addition to reversing the "district court’s group pleading analysis, I would also' have remanded with a determination that the complaints state a valid claim for tortious interference,
Although I agree with its outcome, I have two significant concerns with the majority’s analysis of the claims that prevent me from concurring in the opinion. My first concern with the majority’s analysis of the tortious interference claims is that it makes explicit a sentiment that I fear may have implicitly influenced the majority’s disposition -of other claims: namely that “the market dominance of the defendant companies and the1 percentage-of revenue that the defendant companies generated for a body shop .., establish-the companies’ command over a body shop in each state.” Maj. Op. at 1279. However, whether or not the insurance companies, collectively, have a large market share is plainly not relevant to an inquiry into whether an insurance company tortiously interfered with a customer of a particular body shop. I have previously outlined the three elements of a .tortious interference claim that both are common to all four relevant states and are also contested here. Market power is plainly irrelevant to both the first—the existence of a valid business expectancy— and the second—-the insurance companies’ knowledge of that business expectancy. And as to the third element—improper intentional interference—neither the body shops nor the majority cite any authority suggesting that mere market power can transform otherwise appropriate conduct into improper interference for purposes of a tortious interference claim. Accordingly, I respectfully submit that the majority’s reliance on the market power of the insurance companies is inappropriate.[28]
*1297 Lastly, I write to express my concern with the majority’s brief analysis of group pleading, a doctrine that has plagued this case from the beginning. Specifically, the majority notes that the district court concluded that “at a minimum, Plaintiffs should allege sufficient facts specific to each Defendant, or at least each corporate family of Defendants, to tie that Defendant to the wrongdoing alleged,” Maj. Op. at 1279. It then rejects this premise because “[i]t is unclear why such allegations are necessary.” Maj. Op. at 1279.1 do not find it at all unclear. They are necessary because the purpose of Rule 8 pleading is to provide a “defendant fair notice of what the [plaintiffs] claim is and the grounds upon which it rests.” Twombly, 550 U.S. at 55, 127 S.Ct. at 1964 (quoting Conley v. Gibson, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957)). And whatever else such “fair notice” requires, I think, as the district court clearly did, that “at a minimum, [it requires that] Plaintiffs should allege sufficient facts specific to each Defendant, or at least each corporate family of Defendants, to tie that Defendant to the wrongdoing alleged.” It is, to put it plainly, necessary because a defendant cannot be fairly asked to defend a claim if the alleged facts do not tie that defendant to the wrongdoing.
The problem with the district court’s group pleading analysis in this case is not—as the majority believes—that it unnecessarily required the body shops to tie the insurance companies to the alleged wrongdoing. The problem with the district court’s analysis—and the reason that I join the majority in reversing.with respect to this claim—is that the body shops have in fact done so. Each corporate defendant could read the complaint and fairly discern what it is they are alleged to have done. This—at least in this context—is all that Rule 8 requires and, accordingly, it was error to dismiss the complaints for group pleading. But to suggest that such pleadings are not “necessary” is plainly not true.
Accordingly, although I agree with the majority’s decision to ultimately reverse the dismissal of the tortious interference claims for the reasons I detailed in the opening paragraphs of this section, because of the concerns that I raise about the majority’s reasoning for doing so, I concur-only in the judgment.
IV. Conclusion
With regard to the majority’s reversal of the district court order dismissing the tor-tious interference claims, I concur in the result only. With regard to the remainder of the majority’s opinion, I respectfully dissent.

. The instant appeal represents only a portion of more than twenty such cases filed on behalf of body shops around the country and consolidated in the Middle District of Florida. Notwithstanding this Court’s disagreement with-its resolution of the present issues, I agree with the majority in expressing my gratitude to the district court for its efficient and thorough handling of this extraordinarily complex litigation.

. Of course, an antitrust plaintiff can also offer direct evidence of an agreement or evidence of parallel conduct that is contrary to the defendants' self-interest. The body shops have not done so here and are, accordingly, left with an attempt at adducing evidence of relevant plus factors.

. The body shops argued on appeal that their complaints established at least five plus factors. The majority has relied only on those it identified in its opinion and, therefore, I do not address the body shops’ additional plus factors in any depth. It bears mentioning, however, that I consider them to be wholly without merit.

.In considering each plus factor, I am cognizant of the Supreme Court’s admonition that antitrust plaintiffs receive "the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each.” Cont'l Ore Co. v. Union Carbide & Carbon Corp., 370 U.S. 690, 699, 82 S.Ct. 1404, 1410, 8 L.Ed.2d 777 (1962). At the same time, it is undoubtedly our responsibility "to evaluate the evidence proffered by the plaintiffs not to ascertain its credibility, but instead to determine whether that evidence, if credited, 'tends to’ establish a conspiracy more than it indicates conscious parallelism.” Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1301 (11th Cir. 2003).

. The majority (Maj. Op. at 1274) fails to recognize that the allegation—that the insurance companies told the body shops that they would pay no more than State Farm—gives rise to no inference of prior agreement; to the contrary, it is a straightforward assertion of following the price leader.

. As for what else can be said about that allegation, the fact that the body shops concede that some of the alleged actions, occurred "independently” is certainly, noteworthy. How the majority was able to discern which of the allegedly nefarious activities were conducted “in concert”—a Sherman Act concern—and which were conducted "individually”—a decidedly non-Sherman Act concern—is left unspoken.

. Although I do not consider this failure to be dispositive, treating it as such would not be outlandish. At a bare minimum, we should expect antitrust plaintiffs to state their belief that an agreement was reached before we go off in search of plus factors to support an inference of its existence.

. It is worth noting in my example—as in the instant case—the body shops have not alleged that the complained-of tactics are "identical.”

. The body shops use, and the majority endorses, a similar pleading trick with respect to the “non-exhaustive list of procedures and processes the [defendants refuse to pay and/or pay in full." Maj. Op. at 1270 n.5 (alteration in original).

.Even if the insurance companies were alleged to have used similar or identical reasons as to why their insureds should not use a particular body shop, the reasons suggested— that the body shop charges more or takes longer or does poor quality work—would seem to be obvious reasons, an insurance company would not want its insureds to use that body shop, That is, such similarity would seem to be independent responses to common stimuli.

.See infra note 28, (suggesting my concern that the majority may have'implicitly relied on the insurance companies’ market power, leading it to dilute the requirement that there ■ must be—in addition to consciously parallel conduct—a plus factor giving rise to a plausible inference of an agreement or conspiracy).

. See Jones v. Sparks, 297 S.W.3d 73, 78 (Ky. Ct. App. 2009) (“For a party to prevail under the theory of unjust enrichment, they must prove three elements: (1) benefit conferred upon defendant at plaintiff’s expense; (2) a resulting appreciation of benefit by defendant; and (3) inequitable retention of benefit without payment for its value.”); Binkley v. Am. Equity Mortg., Inc., 447 S.W.3d 194, 199 (Mo. 2014) (“An unjust enrichment claim requires a showing that: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant appreciated the benefit; and (3) the defendant accepted and retained the benefit under inequitable and/or unjust circumstances.” (quotation omitted)); VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 641 A.2d 519, 526 (1994) (“To establish unjust enrichment, a plaintiff must show both that defendant received a benefit and that retention of that benefit without payment would be unjust.”); Schmidt v. Household Fin. Corp., II, 276 Va. 108, 661 S.E.2d 834, 838 (2008) (“To state a cause of action for unjust enrichment, [a plaintiff has] to allege that: (1) he conferred a benefit on [the defendant]; (2) [defendant] knew of the benefit and should reasonably have expected to repay [plaintiff]; and (3) [defendant] accepted or retained the benefit without paying for its value."). Although the Virginia rule statement does not expressly require that retention of the benefit be unjust, such a requirement is routinely read into the elements by Virginia courts. See, e.g., R.M. Harrison Mech. Corp. v. Decker Indus., Inc., 75 Va. Cir. 404, 2008 WL 10669311, at *3 (2008) (“The circumstances of the acceptance or retention of the benefit' must render it inequitable for the defendant not to compensate the plaintiff.”).

. The body shops have consistently argued that they did not have an opportunity to bargain because the insurance companies offered the market rate on a “take it or leave it” basis and that the insurance companies refused to negotiate. If this is all that is necessary to circumvent the rule that parties who are able *1290 to negotiate should be held to do so, the rule will quickly become extinct.

. I submit that the body shops’ allegation of force should be disregarded as a conclusoiy allegation. No concrete facts have been alleged from which might arise a reasonable inference of force.

. For that matter, I see no reason why the majority's logic cannot just as readily be employed as a weapon by consumers against the body shops. Suppose a consumer's car is badly damaged and cannot be driven. Not wanting his insurance rates to increase, he decides to pay for the repairs out of pocket, If one of the body shops charges him an amount in excess of what he thinks he should pay, has he been "forced” to pay that amount? Is it "involuntary”? Is he permitted to sue the body shop and have a court determine the reasonable price of the repair? Is this really what federal courts should be doing? These questions, and many more, are left unanswered in the majority’s opinion.

. Notably, both parties in this example agree that the painter is entitled to some amount ($10,000) just as both parties in our instant case agree that body shops are entitled to some amount (the State Farm "market rate”). The failure to contract then in both cases is for an amount beyond what was agreed to.

. The majority suggests that a mere disparity in bargaining power can invalidate a contract. Maj. Op. at 1276-77. However, the majority cites no case law or other authority to support the novel proposition that mere bargaining power or mere market power is sufficient to invalidate a contract. Moreover, the body shops have not even argued on appeal that a disparity in bargaining power could invalidate a contract, or that it could render unjust the insurance companies’ retention of the benefits conferred. Thus, any such argument, not being fairly raised on appeal, is abandoned. See, e.g., Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 681-83 (11th Cir. 2014).

. This is, of course, on top of the fact that if a couple of other developers all independently decide to pay no more than our hypothetical price leader, the entire group can now be hit with antitrust violations if the majority opinion and its logical consequences are to be the law óf this Circuit.

. See A & E Auto Body, Inc. v. 21st Century Centennial Ins. Co., 2015 WL 12867010, at *5 (M.D. Fla. Jan. 22, 2015) (‘‘[I]n unjust enrichment case, •... ‘a third party providing services to an insured confers nothing on the insurer except a ripe claim for reimbursement.’ " (quoting Adventist Health Sys./Sunbelt Inc. v. Med. Sav. Ins. Co., 2004 WL 6225293, at *6 (M.D. Fla. Mar. 8, 2004))).

.These alternative grounds largely mirror the basis on which I would affirm the district court's decision to dismiss the unjust enrichment claims—namely that the retention of a - benefit (if any) would not be unjust where the body shops knew how much the insurance companies would pay before undertaking the repair and where they also forwent an opportunity to bargain,

.New Jersey has found a benefit to a prison where a private hospital treated an inmate on its behalf. Saint Barnabas Med. Ctr. v. Essex County, 111 N.J. 67, 543 A.2d 34 (1988). While certainly analogous, that case is factually distinguishable based, among other things, on the legal duty a jailer owes to inmates. A federal district court in Kentucky has addressed a similar question in the health insurance context. See Appalachian Reg'l Healthcare v. Coventry Health & Life Ins. Co., 2013 WL 1314154 (E.D. Ky. Mar. 28, 2013). Any conclusions that are drawn therein are obviously not binding bn us or the Kentucky state courts. I have not seen any indication that the Virginia or Missouri courts have addressed this question.

. Compare Myrtle Beach Hosp., Inc. v. City of Myrtle Beach, 341 S.C. 1, 532 S.E.2d 868 (2000), with Emergency Physicians Integrated Care v. Salt Lake County, 167 P.3d 1080 (Utah 2007).

. The Missouri complaint does not include a cause of action for quantum meruit.

. See Raymond, Colesar, Glaspy & Huss, P.C. v. Allied Capital Corp., 961 F.2d 489, 491 (4th Cir. 1992); JP White, LLC v. Poe Cos., LLC, 2011 WL 1706751, at *5 (Ky. Ct. App. May 6, 2011); Weichert Co. Realtors v. Ryan, 128 N.J. 427, 608 A.2d 280, 285 (1992).

. See, e.g., Hindsight Sols., LLC v. Citigroup Inc., 53 F.Supp.3d 747, 776 (S.D.N.Y. 2014) (unjust enrichment claim failed because plaintiff could not have reasonably expected to receive additional compensation); Rodriguez v. Ready Pac Produce, 2014 WL 1875261, at *3 (D.N.J. May 9, 2014) (dismissing unjust enrichment claim where plaintiff “would have no reasonable expectation to receive additional compensation for hours worked in excess of a particular amount per week”).

. See Snow Pallet, Inc. v. Monticello Banking Co., 367 S.W.3d 1, 6 (Ky. Ct. App. 2012) ("[Plaintiff] must prove: (1) the existence of a valid business relationship or expectancy; (2) that [defendant] was aware of this relationship or expectancy; (3) that [defendant] intentionally interfered; (4) that the motive behind the interference was improper; (5) causation; and (6) special damages.”); Clinch v. Heartland Health, 187 S.W.3d 10, 14 (Mo. Ct. App. 2006) ("The elements of tortious interference with a business relationship are: (1) The plaintiff was involved in a valid business relationship; (2) the defendant was aware of the relationship; (3) the defendant intentionally interfered with the relationship, inducing its termination; (4) the defendant acted without justification; and (5) the plaintiff suffered damages as a direct result of defendant's conduct.”); Lamorte Burns & Co., Inc. v. Walters, 167 N.J. 285, 770 A.2d 1158, 1170 (2001) (“To prove its claim, plaintiff must show that it had a reasonable expectation of economic advantage that was lost as a direct result of defendants’ malicious interference, and that it suffered losses thereby.”); Dunlap v. Cottman Transmission Sys., LLC, 287 Va. 207, 754 S.E.2d 313, 318 (2014) (“The necessary elements to establish a prima facie case are: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.... [A] plaintiff, in order to present a prima facie case of tortious interference, must allege and prove not only an intentional interference, but also that the defendant employed improper methods.” (alterations and quotations omitted)).

. The majority’s explicit reliance on market power in the contexts of both tortious interference and unjust enrichment (see supra, note 18), and the prominence of the majority’s recitation in its Part II.A of the facts relating to market dominance, lead roe to fear that the majority may have implicitly relied on market power in its resolution of other claims. In the price-fixing context for example, I fear that this concern may have lured the majority into holding that market power, coupled only with consciously parallel conduct, is sufficient to warrant an inference of agreement or conspiracy to fix prices notwithstanding the absence of any plausible factual allegations giving rise to such inference, and notwithstanding that the actual facts indicate that convergent pricing (especially in light of the price leadership) would be the expected course of events. If the majority is implicitly holding that market power—coupled -only with consciously parallel conduct in the form of price leadership—is a sufficient plus factor to warrant an inference of agreement or conspiracy for antitrust purposes, I respectfully submit that such a complex and novel holding should be explored only after thorough briefing and full analysis, In any event, I would disagree with any such holding for at least two reasons: first, that argument has not been fairly raised in the body shops’ appellate briefing, and therefore has been abandoned, see, e.g., Sapuppo v. Allstate Floridian Ins. Co, 739 F.3d 678, 681-83 (11th Cir. 2014) ("A party fails to adequately ‘brief’ a claim when he does pot 'plainly and prominently’ raise it....”); and second, even if market power could in an appropriate case be considered to have any relevance in the “plus factor” analy *1297 sis—an issue which I need not address—it would not warrant an inference of agreement or conspiracy in the instant case where convergent pricing is so clearly to be expected.